Howard A. Belodoff, ISB No. 2290
BELODOFF LAW OFFICE PLLC
1004 West Fort Street
Boise, ID 83702
Telephone: (208) 331-3378
Facsimile: (208) 947-0014
Email: hbelodoff@hotmail.com

Jeremiah M. Hudson, ISB No. 8364
Fisher Rainey Hudson
910 W. Main St., Ste. 254
Boise, ID 83702
Telephone: (208) 345-7000
Facsimile: (208) 297-2689
Email: jeremiah@frhtriallawyers.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHANE JEPSEN, an individual, ) | |
| ) | |
| Plaintiff, ) | Case No.: CV 1:13-454-BLW |
| ) | |
| v. ) | STATEMENT OF ALLEGED FACTS |
| ) | FOR RESPONSE TO MOTION TO |
| CORRECTIONS CORPORATION OF ) | DISMISS PURSUANT TO |
| AMERICA, a Tennessee Corporation and ) | FED. R. CIV. P. 12(b)(6) |
| KEVIN MYERS, in his individual and ) | |
| official capacity. ) | |
| ) | |
| Defendants ) | |
| ) | |

**THE COURT SHOULD CONSIDER ALL ALLEGED PLAUSIBLE FACTS AND REASONABLY DRAWN INFERENCES IN THE COMPLAINT AS TRUE**

The Court must consider all plausible factual allegations and reasonably drawn inferences in Plaintiff's Complaint as true at the pleading stage. CCA contends that Plaintiff's allegations that it "acted under color of state law is nothing more than a conclusory statement – a formulistic recitation of the element of his claim." Dkt. 10 at 11. CCA fails to consider the Plaintiff's factual

STATEMENT OF FACTS FOR RESPONSE TO MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) – Page 1

allegations which distinguish this action from the application of the state action tests in the cases relied upon by CCA. The ICC was built with taxpayer funds on state land and is owned by the state of Idaho. Dkt. 1 ¶2. CCA has a $29 million annual contract to operate and manage the ICC. *Id*. ¶¶1&47. The contract serves the public purpose of incarcerating over 2000 medium and close custody Idaho inmates who would otherwise be incarcerated at Idaho prisons at a greater cost to the taxpayers. *Id*. ¶3. The State entered the contract because it determined that CCA could manage and operate the ICC for less than it would spend if operated by the Idaho Department of Corrections ("IDOC"). *Id*. ¶5.[1] CCA has operated ICC for less than the IDOC would have spent during the term of the contract. *Id*. ¶6. The Idaho Board of Correction ("Board") has mandatory and comprehensive statutory requirements governing "the direction and management of all correctional facilities" and contracts with private prison contractors for the "management or operation of private prison facilities . . . subject to the requirements and limitations set forth in section 20-241A, Idaho Code." See Idaho Code § 20-209(1) and (2).[2]

Idaho Code § 20-241A(1) authorizes the Board and the IDOC to extensively regulate the terms of CCA's contract and monitors compliance to ensure it is meeting all requirements of state and federal law and the Constitution of the State of Idaho and the United States Constitution for the housing, care and control of inmates incarcerated at the ICC. Dkt. 1 ¶7. CCA is considered as acting as an **"agent"** of the state when it receives custody of inmates and retains jurisdiction over the inmates. *Id*. ¶¶11-12. Idaho Code § 20-241A(1)(a). The contract could not

---

[1] Plaintiff has not been able to conduct discovery. Plaintiff does not have access to the contract or other relevant documents so is unable to fully describe the specific terms and policies which may be relevant to the state action inquiry at this time.

[2] The Court may take judicial notice of state statutes and "of the records of state agencies and other undisputed matters of public record" without transforming a motion to dismiss into a motion for summary judgment. *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 n1 (9th Cir. 2004).
STATEMENT OF FACTS FOR RESPONSE TO MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) – Page 2

be awarded unless CCA demonstrated to the satisfaction of the Board that it could "provide the necessary qualified personnel to implement the terms of the contract; . . . has the ability to comply with applicable court orders and correction standards; and . . . the correctional services proposed by [CCA] meet constitutional standards." Idaho Code § 20-241A(2)(b). Dkt. 1¶¶13-14. CCA is required to indemnify the state against claims or losses arising from the operations of ICC. Idaho Code § 20-241A(2)(c).

The director of the IDOC is required to monitor the performance of CCA and he retains clear supervisory and monitoring powers over CCA's operation and management of the ICC to ensure that inmates are cared for and that the employees of the facility and the public are adequately protected. Dkt. 1¶8. Idaho Code § 20-241A(6). Included in these powers and responsibilities are approval of the training program for CCA employees, "[p]romulgation of rules interpreting or making specific application of the provision of the section [Idaho Code § 20-241A]" and "[a] determination if appropriate policies and procedures of the Idaho department of correction are being followed by [CCA] and its personnel; . . ." Idaho Code § 20-241A(6) (c),(d), and (f). The state restricts the activities of CCA in the operating and managing of the ICC by prohibiting the reclassification of an inmate's security custody and taking any disciplinary actions contrary to the rules and procedures approved by the IDOC. Idaho Code § 20-241A(7) (c). CCA is not permitted to "[d]evelop or implement procedures regarding the care, custody and treatment of inmates which are contrary to the [IDOC's] policies and procedures, state or federal law." Idaho Code § 20-241A(7)(d).

Jepsen was the Chief of Security at the ICC. Dkt. 1¶23. His supervisors were the ICC's Warden and Assistant Wardens. *Id*. ¶24. ICC is an extremely violent prison and has come to be known as the "Gladiator School." *Id*. ¶17. The level of inmate on inmate violence in the ICC was

STATEMENT OF FACTS FOR RESPONSE TO MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) – Page 3

significantly higher than in other prisons operated by the IDOC. *Id*. ¶18. The inmates filed a complaint in the United States District Court for the District of Idaho, *Kelly v. Wengler*, Case No. 1:11-CV-185-S-EJL, ("*Kelly*") which alleged that the violence perpetrated upon them while incarcerated at the ICC and the inadequate staffing and training and other policies of the CCA in the operation and management of the facility violated their rights under the Eighth Amendment.[3] *Id*. ¶19. CCA agreed to a Settlement Agreement that required, in relevant part, to provide mandatory staffing of posts by security staff in the ICC as required by the contract and the Settlement Agreement. *Id*. ¶20. See *Kelly* Dkt. 25, Exhibit A. The Settlement Agreement provided that the plaintiffs' counsel could monitor CCA's compliance for two years until mid September 2013 unless extended by the Court. *Id*. ¶¶21-22.[4]

CCA's contract with the IDOC requires 342.9 staffing positions to be filled including the plus three positions required by the Settlement Agreement in *Kelly*. Declaration of Kevin Myers ¶10. Appendix 4. CCA authorized and budgeted more positions than required by the contract. *Id*. "Typically there were 55 posts on the day shift classified as mandatory, and 37 on the night shift." Dkt. 2-4 Exhibit P, *Kelly*, Dkt. 76 at 7 n5. Jepsen, as early as November 2010 and on a continual basis thereafter, informed the Warden of ICC, Timothy Wengler, and two Assistant Wardens of staffing vacancies and inaccuracies in the staffing records. *Id*. ¶25. *Id*. at 8. Jepsen made requests to Warden Wengler for additional staff to fill the security staff vacancies and shortages on the shifts in order to comply with the Court Settlement Agreement and contract.

---

[3] Plaintiff requests that the Court take judicial notice of the documents filed and the Memorandum Decision and Order, Dkt. 76, issued in *Kelly v. Wengler* which are relevant to the present action. Plaintiff does not have complete access the documents and exhibits admitted by the Court in *Kelly* because they have been redacted and sealed at CCA's request.

[4] On September 16, 2013 the Honorable David O. Carter, United States District Judge, For the Central District of California Sitting by Special Designation, issued a Memorandum Decision and Order, Dkt. 76, and found that CCA was in civil contempt for violating the Settlement Agreement. Dkt. 2-4 Exhibit P.
STATEMENT OF FACTS FOR RESPONSE TO MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) – Page 4

Dkt. 1 ¶26. See Dkt. 2-4 Exhibit P, *Kelly* Dkt. 76 at 8. Staffing shortages were common knowledge among the security staff and supervisors and occurred on a daily basis. Dkt. 1 ¶27. See *Kelly* Dkts. 70¶¶4-5, 10-14 & 16 and 71¶¶6-19. Appendix 2&5. ICC staff indicated that the staff shortages "compromised the staff and inmate safety" and resulted in increasing number of violent assaults against inmates and their severity. See *Kelly* Dkt. 70 ¶¶6-8 and Dkt. 71 ¶14. Appendix 2&5. Security staff was told to make do with the officers they had available. *Id*. ¶28.

Security staff reported the staffing shortage directly to officials at the CCA and on the online reporting system. *Id*. ¶29. Jepsen informed Warden Wengler of his concerns about CCA's failure to comply with the staffing requirements of the contract and the Settlement Agreement. *Id*. ¶¶30&43. Jepsen had no authority or ability to rectify or address the staffing vacancies and shortages. *Id*. ¶42.Warden Wengler regularly examined and approved the staffing rosters. *Id*. ¶¶31&44.Warden Wengler made changes to the staffing rosters which did not have the necessary detail to disclose the failure to staff mandatory posts, what hours were actually worked and the ability to spot actual double postings. *Id*. ¶32.

The IDOC was made aware of the staffing vacancies and concerns raised by Jepsen during their monitoring and meeting with state officials at the ICC. *Id*. ¶33. See Dkt. 2-4 Exhibit P, *Kelly* Dkt. 76 at 8-9. On June 3, 2010, at a regular monthly meeting between IDOC monitors and CCA officials, including Defendant Myers, IDOC Contract Monitor Matt Vallard ("Monitor Vallard") discussed the staffing vacancies he discovered after his review of the staff rosters from April of 2010. *Id*. ¶¶62-63. Monitor Vallard informed CCA that the staff rosters indicated most pods were being reduced to 2 or 3 officers during the evening hours and in the PIE building there were often only 2 officers on duty instead of the 3 required. *Id*. ¶63. Monitor Vallard informed CCA that housing unit security posts during the second shift at ICC were being vacated around

10:30pm and not being staffed again until around 5:30am. *Id*. ¶64. Jepsen did not attend the June 3, 2010 meeting and was never informed of the staffing shortages that were discussed. *Id*. ¶¶66-67. Jepsen was never disciplined or reprimanded as a result of any of the staff shortages discussed at the June 3, 2010 meeting. *Id*. ¶68.

On September 10, 2010, Jepsen sent an email to Warden Wengler and CCA detailing the regularly vacant posts during each day and night shift from August 27, 2010 through September 9, 2010. *Id*. ¶70. The night shift vacancies ranged between six (6) and twelve (12) employees per shift. *Id*. On November 3, 2010, Jepsen sent a memorandum ("Jepsen Memo") to Warden Wengler, stating that after reviewing shift rosters audited by IDOC, common problems included (a) posting of Sergeants, Correctional Counselors, and Case Managers into Correctional Officer vacancies, and (b) staff working two to three posts during a shift without any explanation, "giving the appearance of Officer Doe covering three posts." *Id*. ¶71. Jepsen recommended that CCA hire to fill each vacancy and to amend the contract with IDOC and stated that he did not have the answer to avoiding putting supervisors and case managers in correctional officer positions, "as this has always been common practice." *Id*. ¶73.

On December 20, 2010, Natalie Warner, an IDOC official, detailed specific problems IDOC found with staffing at ICC. *Id*. ¶74. On January 28, 2011, Jepsen sent an email stating, among other things "There needs to be more effort placed on keeping the rosters up to date, at all times" and further stated "<u>All mandatory post's must be filled at all times</u>, you will have to plan ahead and ensure this is adhered to […]." *Id*. ¶75. On June 13, 2011, Natalie Warner sent a letter to Natasha Metcalf, Vice President of Customer Contracts for CCA, regarding IDOC's prior assessment that CCA had not complied with the contractually required staffing at ICC. *Id*. ¶76. In the Fall of 2011, Jepsen informed Defendant Myers that on multiple occasions, the ICC did

not have enough employees to cover the contractual staffing requirements. *Id*. ¶78. Jepsen ordered ICC staff to fill positions and correctly complete the staffing rosters. *Id*. ¶¶79-83.

The IDOC continually informed CCA of their concerns with the staffing shortages and vacancies as early as the October 27, 2010 through December 20, 2010. *Id*. ¶34 Exhibit D. Warden Wengler, in response to the IDOC staffing concerns, represented in January 2011 that "CCA is committed to ensuring that all mandatory posts are filled at all times," and committed to provide shift rosters with the detail needed for IDOC to monitor the staffing practices at the ICC. *Id*. ¶35 and Exhibit P, *Kelly* Dkt. 76 at 9. In June of 2011, IDOC's monitor wrote CCA's Vice President that housing units' security posts were not being filled during the day shift. *Id*. Exhibit P, *Kelly* Dkt. 76 at 9. The "IDOC's deputy warden for contract prison oversight unit" testified at the contempt hearing in *Kelly* that CCA's shift rosters would not specify what hours were worked which made it difficult to spot actual double posting by the same officer. *Id*. Exhibit P, *Kelly* Dkt. 76 at 10. Warden Wengler testified that ICC used supervisors and case managers as floor security officers two to three times per week. *Id*. The IDOC determined this was an "unacceptable practice." *Id*. Jepsen testified that non-correctional officers would cover a correctional officer's shift four times per week. *Id*.

In late December of 2012, Captain Johnson informed Jepsen of a conversation he had with Monitor Vallard regarding the falsification of shift documents at the ICC and the possibility that it could result in the arrest and prosecution of CCA employees. Dkt. 1 ¶84 and Exhibit L. Jepsen instructed Captain Johnson to submit a 51-C form to CCA documenting his conversation with Monitor Vallard. *Id*. ¶85. The 51-C form was forwarded to Defendant Myers and the Assistant Wardens. *Id*. ¶86. On January 23, 2013 a reporter from the Associated Press published an article entitled "Inmates Claim private prison falsifies staff logs." *Id*. ¶88. The same day, the

IDOC announced the Idaho State Police were going to investigate CCA. *Id*. ¶36. On January 25, 2013 Defendant Myers, who was responsible for the overall supervision and management of the ICC for CCA, reported to the IDOC the allegations of falsified shift rosters were credible. *Kelly Dec. of Myers at ¶¶2&4 Appendix 4*.[5] In 2010 CCA officials changed the format of the staff rosters so that IDOC Monitors would not be able to detect shift vacancies and thereby making it possible for ICC to falsify employment rosters without detection. *Id*. ¶116. On January 28, 2012 IDOC, pursuant to an Idaho public records request, produced ICC's shift logs and overtime reports to the Associated Press reporter. *Id*. ¶89. That same day CCA placed Jepsen on administrative leave because of a "preliminary determination that [Jepsen and Melody] were aware of and/or involved in the conduct resulting in the shift roster discrepancies…" and "[t]hey posed a risk to the investigation" and CCA's investigator "found no evidence that either Melody or Jepsen informed their superiors, including Warden Wengler, about the roster falsification…." *Id*. ¶¶90-91. However it was not until January 30, 2013, that the CCA investigator first interviewed Jepsen about staff roster falsification. *Id*. ¶¶92-93.

CCA informed the IDOC that it was investigating the staffing shortages. Dkt. 1 ¶39. On April 23, 2013 Defendant Myers terminated Jepsen's employment with CCA. *Id*. ¶99. Myers

---

[5] Defendant Myers' Declarations in *Kelly* asserted that prior to January 25, 2013, they "had no specific knowledge about any ICC shift roster discrepancies, nor did I know that the shift rosters were being falsified or compromised in anyway." Appendix 4 at ¶3. However the minutes of the June 10, 2010 "Monthly ICC Meeting" indicates Defendant Myers and Warden Wengler participated in the meeting in which Monitor Vallard indicated that housing security posts were being vacated at 2230 hours and not staffed again until 0530 hours and that the rosters indicated that staff in most pods are being reduced 2 to 3 officers during those evening hours and in the PIE building there were only 2 officers instead of the required 3 officers on duty.  Dkt. 2 at 3 Exhibit A ("Security Staffing – 24/7 post being left vacant – Matt Vallard). The December 20, 2010 letter to Warden Wengler from Natalie Warner, IDOC Quality Assurance Manager for Evaluation and Compliance, refers to an IDOC memorandum dated October 27, 2010, a November 1, 2010 meeting with ICC staff and a CCA response dated November 9, 2010 which address the failure to meet the staff requirements of the contract and the discrepancies with the staffing rosters previously discussed at the June 10, 2010 meeting. Dkt. 2-1 at 4 Exhibit D. See also Dkt. 1 ¶¶ 79-83.

stated that Jepsen's termination was for the following reasons: (a) the ICC staffing records contained inaccurate information and the staffing for mandatory posts could not be verified, (b) Jepsen was responsible for ICC's compliance with staffing patterns for security and the accuracy of accompanying documentation, and (c) Jepsen "may have had some knowledge of vacancies or inaccuracies in staffing records but failed to investigate and take corrective action." *Id*. ¶100 Exhibit O. Jepsen did not fill out a staff roster that was falsified, nor did he instruct any other employee to do so. *Id*. ¶101. CCA has not terminated any ICC employee except Jepsen and Melody for actually falsifying the staff rosters. *Id*. ¶102.

CCA informed the IDOC of the reasons for Jepsen's termination. *Id*. ¶39. The problem of not staffing mandatory posts and staff vacancies continues at the ICC. *Id*. ¶46. CCA has publically sought to place the blame on Jepsen for the staffing shortages to divert their failure and responsibility to comply with the contract and Settlement Agreement. Dkt. 1¶45. CCA terminated Jepsen to protect their reputation and ability to renew their $29 million contract and to prevent the Court from finding CCA in contempt and extending the term of the Settlement Agreement for failing to comply with the staffing requirements. *Id*. ¶¶47, 113-115.

Dated January 21, 2014.

By: /s/ *Howard A. Belodoff*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st of January, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing and a copy of this document to the following persons:

Michael J. Elia
MOORE AND ELIA, LLP
P. O. Box 6756
Boise, ID 83707
Tel:  (208) 336-6900
Fax: (208) 336-7031
Email: mje@mbelaw.net

Peter F. Munger
JACKSON LEWIS P.C.
950 17TH St., Suite 2600
Denver, CO 80202
Tel:  (303) 892-0404
Fax: (303) 892-5575
Email: peter.munger@jacksonlewis.com

/s/_____
Howard A. Belodoff