UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

----oo0oo----

| | |
|---|---|
| SHANE JEPSEN, an individual,<br><br>        Plaintiff,<br><br>   v.<br><br>CORRECTIONS CORPORATION OF AMERICA, a Tennessee Corporation; and KEVIN MYERS, in his individual and official capacity,<br><br>        Defendants. | CIV. NO. 1:13-454 WBS<br><br>MEMORANDUM AND ORDER RE: MOTION TO DISMISS |

----oo0oo----

Plaintiff Shane Jepsen brought this action against defendants Corrections Corporation of America ("CCA") and Kevin Myers arising out of the termination of plaintiff's employment at the Idaho Correctional Center ("ICC"). Defendants now move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted.

1

I. Factual & Procedural Background

CCA is a for-profit corporation that operates prisons across the country, including the ICC. (Compl. ¶ 51.) Kevin Myers is an employee of CCA and is the Managing Director of the ICC. (Id. ¶ 52.) Under the terms of a contract signed by CCA and the State of Idaho, CCA is responsible for operating and managing the ICC, which houses over 2,000 prisoners. (Id. ¶ 51.) Plaintiff began working at the ICC in 2000 as a correctional officer and was promoted to Chief of Security in 2008. (Id. ¶¶ 56-57.)

Plaintiff alleges that defendants became aware of persistent staffing vacancies at the ICC in 2010 and that CCA officials "reformatted the ICC staffing [r]osters" to conceal those staffing vacancies. (Id. ¶¶ 62-69.) On September 10, 2010, plaintiff informed CCA and Warden Timothy Wengler of these staffing vacancies in an e-mail "detailing the vacancies during each day and night shift from August 27, 2010 through September 9, 2010." (Id. ¶ 70.) On November 3, 2010, plaintiff circulated a memorandum to Wengler and two Assistant Wardens documenting vacancies at the ICC. (Id. ¶¶ 71-73.) Plaintiff "recommended that CCA hire accordingly to fill each vacancy[] and amend the contract with IDOC."[1] (Id. ¶ 73.) Plaintiff continued to raise the issue of staffing vacancies to his supervisors and to other CCA employees throughout 2011 and 2012. (Id. ¶¶ 75-83.)

In early January 2013, Captain Earl Johnson informed plaintiff that an IDOC official was aware that "there may be

---

[1] "IDOC" is an acronym for the Idaho Department of Corrections.

2

potential falsification of shift documents" and that ICC officials could face prosecution as a result. (Id. ¶ 84.) Plaintiff obtained written documentation of these reports from Johnson and forwarded them to Myers and two Assistant Wardens at the ICC. (Id. ¶¶ 85-86.) Later that month, a reporter with the Associated Press published an article about allegations that ICC employees had falsified shift rosters. (Id. ¶ 88.) CCA placed plaintiff on administrative leave on January 28, 2013. (Id. ¶ 90.)

After CCA conducted an internal investigation, it issued a press release on April 11, 2013 in which it stated that it had discovered "some inaccuracies" in shift rosters, that it had informed IDOC of these inaccuracies, and that it "deeply regret[ted] the decisions made by ICC staff members." (Id. ¶ 98.) The press release stated that CCA "will take appropriate disciplinary action with the involved personnel." (Id.) CCA terminated plaintiff's employment on April 23, 2013. (Id. ¶ 99.)

That day, Myers allegedly sent plaintiff a letter informing plaintiff that CCA's investigation had revealed inconsistencies in the staffing records, that compliance with the staffing requirements set by IDOC fell within plaintiff's duties as Chief of Security, and that there was evidence that plaintiff had "failed to investigate and take corrective action." (Id. ¶ 100.) Myers allegedly held meetings with ICC staff members later that month in which he informed ICC employees that plaintiff "had been terminated as a result of the roster falsification." (Id. ¶ 104.) Plaintiff also alleges that "CCA officials publicly disclosed Jepsen's termination within the relatively small

3

community of corrections professionals in Idaho." (Id. ¶ 106.) Plaintiff alleges that Myers' accusations of wrongdoing are false and that Myers and "CCA officials used [plaintiff] as a scapegoat for CCA's wrongdoing." (Id. ¶ 115.)

Plaintiff brought this action on October 21, 2013, and alleges five[2] claims: (1) a claim against CCA under the Idaho Protection of Public Employees Act, I.C. § 6-2101; (2) a claim against CCA for wrongful termination in violation of public policy; (3) a claim against both CCA and Myers for deprivation of procedural due process in violation of 42 U.S.C. § 1983; (4) a claim against both CCA and Myers for intentional infliction of emotional distress (sometimes "IIED"); and (5) a claim against both CCA and Myers for negligent infliction of emotional distress (sometimes "NIED").[3] (Docket No. 1-1.) Defendants now move to dismiss the Complaint pursuant to Rule 12(b)(6) for failure to state a claim on which relief can be granted. (Docket No. 10.)

II. Discussion

On a motion to dismiss, the court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v.

---

[2] Although plaintiff alleges a single cause of action for "Intentional and/or Negligent Infliction of Emotional Distress," (Id. ¶¶ 155-163), Idaho law treats negligent and intentional infliction of emotional distress as separate causes of action. See, e.g., Curtis v. Firth, 123 Idaho 598, 601 (1992). The court will therefore analyze plaintiff's negligent and intentional infliction of emotional distress claims separately.

[3] Plaintiff contends, and defendants do not dispute, that the court may exercise diversity jurisdiction over his state-law claims even if it dismisses plaintiff's sole federal claim under § 1983. (See Compl. ¶¶ 50-53.)

4

Scherer, 468 U.S. 183 (1984); Cruz v. Beto, 405 U.S. 319, 322 (1972). To survive a motion to dismiss, a plaintiff needs to plead "only enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). This "plausibility standard," however, "asks for more than a sheer possibility that a defendant has acted unlawfully," and where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 556-57).

    A.    42 U.S.C § 1983

        In relevant part, § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress . . . .

42 U.S.C. § 1983. While § 1983 is not itself a source of substantive rights, it provides a cause of action against any person who, under color of state law, deprives an individual of federal constitutional rights or limited federal statutory rights. Id.; Graham v. Connor, 490 U.S. 386, 393-94 (1989).

    "Although § 1983 makes liable only those who act under color of state law, even a private entity can, in certain circumstances, be subject to liability under section 1983." Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1139 (9th Cir. 2012) (citation and internal quotation marks omitted). In order to allege that a private entity acted under color of state law, a

plaintiff must allege facts showing that "the conduct allegedly causing the deprivation of a federal right [was] fairly attributable to the State." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982).

"The Supreme Court has identified at least four tests for determining whether a private entity's actions "amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus [or pervasive entwinement] test."[4] Franklin v. Fox, 312 F.3d 423, 445 (9th Cir. 2002). "Satisfaction of any one test is sufficient to find state action, so long as no countervailing factor exists." Kirtley v. Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003) (citation omitted); see also Brentwood, 531 U.S. at 304 (holding that if the "facts justify a conclusion of state action under [one] criterion," that "conclusion [is] in no sense unsettled merely because other criteria of state action may not be satisfied by the same facts"). Plaintiff contends that CCA's conduct constitutes state action under both the public function and pervasive entwinement tests. (Pl.'s Opp'n at 3-12 (Docket No. 13).)

1. Public Function Test

"Under the public function test, 'when private individuals or groups are endowed by the State with powers or

---

[4] While the leading Supreme Court case labels this test the "pervasive entwinement test", see Brentwood Acad. v. Tenn. Secondary Sch. Athletics Ass'n, 531 U.S. 288, 304 (2001) courts in the Ninth Circuit frequently use the term "governmental nexus test." See, e.g., Lee v. Katz, 276 F.3d 550, 554 n.4 (9th Cir. 2002). Because plaintiff and the Supreme Court have both used the label "pervasive entwinement," the court will do so as well.

6

functions governmental in nature, they become agencies or instrumentalities of the state and subject to its constitutional limitations.'" Lee, 276 F.3d at 554-55 (quoting Evans v. Newton, 382 U.S. 296, 299 (1966)). "To satisfy the public function test, the function at issue must be both traditionally and exclusively governmental." Id. at 555 (citing Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1982)). The Ninth Circuit has recognized that under the public function test, a private entity "may be a state actor for some purposes but not for others." George v. Pac.-CSC Work Furlough, 91 F.3d 1227, 1230 (9th Cir. 1996) (citing Gorenc v. Salt River Project Agric. Improvement & Power Dist., 869 F.2d 503, 509 (9th Cir. 1989)).

The Supreme Court has left open the question of whether a private prison corporation is a state actor with respect to its management of prisons like the ICC. See Richardson v. McKnight, 521 U.S. 399, 413 (1997). The court need not resolve this question because plaintiff's allegations establish that CCA acted in its role as plaintiff's employer, rather than in its custodial role over the ICC's inmates, when it terminated plaintiff's employment. Because those allegations relate to CCA's "hiring and firing of its employees," rather than its supervision of the ICC's inmates, plaintiff can only prevail under the public function test if he can show that CCA exercised a public function when it terminated plaintiff's employment. Gorenc, 869 F.2d at 507.

The facts in George closely parallel the facts here. There, the plaintiff correctional officer observed numerous safety and security violations at a correctional facility

operated by defendant, a corporation that contracted with San Diego County to operate the facility. 91 F.3d at 1229. The plaintiff reported these violations to the corporation's management, despite instructions from his supervisor not to do so, and was terminated shortly thereafter for reasons that the plaintiff claimed were a pretext for retaliation. Id. The Ninth Circuit held that the defendant was not a state actor under the public function test. Id. at 1230. Even if "incarceration is a traditional state function," the court reasoned, the defendant did not occupy a traditional state function in its "role as an employer." Id.

Nor do plaintiff's allegations show that CCA was "acting as the government when it made the staffing decisions on which the termination was based." (Pl.'s Opp'n at 7.) Plaintiff has alleged that CCA is subject to IDOC's "supervisory and monitoring power" with respect to its "operation and management of the ICC," that it is "required to only employ persons who satisfy . . . personnel policies" set by state officials," and that it is required "to train its personnel to a level acceptable to the [IDOC]." (Compl. ¶¶ 8-10.) But even if these allegations are sufficient to establish that IDOC or other state agencies set standards that CCA was required to follow when making employment decisions, the relevant question is whether CCA was exercising a "traditional and exclusively governmental function" when it terminated plaintiff. Lee, 276 F.3d at 555.[5]

---

[5] Plaintiff's reliance on Kelly v. Wengler, --- F. Supp. 2d ----, Civ. No. 1:11-185 EJL, 2013 WL 5797310 (D. Idaho Sep. 16, 2013), is similarly unavailing. Although that decision found that CCA had violated the terms of an earlier consent decree by

8

Cornish v. Correction Services Corporation, although not controlling, is instructive. 402 F.3d 545 (5th Cir. 2005). Like the plaintiff in George, the plaintiff in Cornish alleged that he was terminated by his employer, a private corporation that managed a juvenile detention facility, in retaliation for reporting unlawful conduct. Id. at 547-48. The plaintiff alleged that the defendant occupied a public function because its employees were "required to obtain the same certifications" and were "regulated by the same government entities" as correctional officers employed by the state. Id. at 550. The court held that these allegations established only that the defendant acted under color of state law "in providing juvenile correctional services." Id. (citing George, 91 F.3d at 1230). By contrast, the court held that defendant had not stated a claim under § 1983 because these allegations did not establish that defendant "acted under color of state law in terminating [plaintiff's] employment." Id.

As in Cornish, plaintiff's allegations that the IDOC set standards for hiring and training ICC employees do not show that CCA was performing a public function or that its "decisions as an employer are fairly attributable to the State." Id. at 550; see generally Jackson v. Metro. Edison Co., 419 U.S. 345,

---

maintaining inadequate staffing levels at the ICC, it did not discuss whether CCA's failure to maintain adequate staffing constituted state action. See id. at *4-7.

More importantly, Kelly is inapposite because it concerned allegations that the ICC's inadequate staffing levels violated the Eighth Amendment rights of its inmates. See id. at *2. Even if these allegations implicate state action insofar as they relate to CCA's care and supervision of its inmates, it would not follow that CCA exercised a public function when it made discrete hiring and firing decisions like the one at issue in this action. See George, 91 F.3d at 1230.

9

350 (1974) ("The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State . . . ."). Accordingly, because plaintiff has not alleged that defendant was exercising a "traditionally and exclusively" governmental function when it terminated his employment, Lee, 276 F.3d at 555, he has not shown that CCA's conduct constitutes state action under the public function test.

        2.    Pervasive Entwinement Test

The pervasive entwinement test focuses on whether "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950, 955 (9th Cir. 2008) (citing Brentwood, 531 U.S. at 295); see also Brentwood, 531 U.S. at 299 (noting that state action exists where a defendant's "nominally private character . . . is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings"). When a plaintiff alleges retaliatory termination, the Ninth Circuit has clarified that the pervasive entwinement test "consider[s] whether [the plaintiff's] pleadings demonstrate sufficiently close state involvement in [the defendant's] decision to fire him." George, 91 F.3d at 1230-31; see also Gorenc, 869 F.2d at 507 (holding that, under the pervasive entwinement test, a private entity may be treated as a state actor "for some purposes . . . while for other purposes it has only the power of a private company").

Here, plaintiff contends that his allegations demonstrate an "extensive and complex" relationship between CCA

10

and IDOC, in which IDOC retained considerable authority over ICC's hiring, staffing, and training decisions. (See Pl.'s Opp'n at 10-11.) As with the public function test, these allegations do not establish that IDOC or any other state agency was entwined in discrete hiring and firing decisions.

The Ninth Circuit's decision in George is also germane to this issue. There, the plaintiff relied heavily on a copy of his employment contract with the defendant, which the plaintiff offered as proof of "governmental involvement with the hiring decision" and that the government "could have regulated its employment decisions." 91 F.3d at 1231. Although the court conceded that this contract "does show that the County regulates [defendant's] employees to some degree," and that the County "retains the right to preclude [defendant] from employment or continued employment of any individual at the facility," it nonetheless held that "[t]here is . . . no County or state regulation of [defendant's] employment termination or disciplinary processes." Id.

The Ninth Circuit recently reaffirmed this reasoning in Caviness v. Horizon Community Learning Center, Inc., where it held that the termination of the plaintiff, a teacher at a charter school operated by defendant, did not constitute state action. 590 F.3d 806, 818 (9th Cir. 2010). There, the plaintiff argued that because the state "regulates the personnel matters of charter schools," it was pervasively entwined with the decision to terminate him. Id. at 816. The Ninth Circuit disagreed and held instead that "[e]ven when the state has the power 'initially to review the qualifications of a[n employee] selected by the

11

school,' such regulation is not sufficient to make the school's employment-related actions those of the state." Id. at 817-18 (citing Rendell-Baker, 457 U.S. at 838 n.6). Because the plaintiff did not allege "that the state was involved in the contested employment actions, or that it showed any interest in the school's personnel matters," the Ninth Circuit concluded that the plaintiff had failed to allege state action. Id. at 818 (citations and internal quotation marks omitted).

Like the plaintiff in George, plaintiff's allegations establish only that he suffered a "contractor-initiated termination" involving CCA's "day-to-day management" of its employees. 91 F.3d at 1231. And like the plaintiff in Caviness, plaintiff's termination involved personnel decisions that "were made by concededly private parties [] and turned on judgments made by private parties without standards established by the State." 590 F.3d at 818 (citing Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 53 (1999)). Accordingly, because plaintiff has not satisfied either the public function or pervasive entwinement tests, and has not alleged any other facts showing that his termination was "fairly attributable to the State," Lugar, 457 U.S. at 937, the court must grant defendants' motion to dismiss this claim.[6]

B. Idaho Protection of Public Employees Act

The Idaho Protection of Public Employees Act ("IPPEA")

---

[6] Because plaintiff has failed to allege that CCA acted under color of state law, and has alleged no facts showing that Myers acted under color of state law independently of his involvement in plaintiff's termination, plaintiff also fails to state a cognizable claim under § 1983 against Myers.

12

provides "a legal cause of action for public employees who experience adverse action from their employer as a result of reporting waste and violations of a law, rule, or regulation." I.C. § 6-2101. The IPPEA applies to conduct by a public "employer," which the statute defines as "the state of Idaho," I.C. § 6-2103(4)(a), "any political subdivision or governmental entity eligible to participate in the public employees retirement system," or the "agent of an employer," I.C. § 6-2103(4)(b).

Although CCA is plainly not the State of Idaho or a governmental entity, plaintiff alleges that CCA is liable under the IPPEA because "it is an agent of the State of Idaho." (Compl. ¶ 121.) "Agency is a fiduciary relationship in which the principal confers authority upon the agent to act for the principal." Gissel v. State, 111 Idaho 725, 728 (1986). "[A]n essential element of agency is the principal's right to control the agent's actions." Restatement (Third) of Agency § 1.01, comment (f)(1); accord Sharp v. W.H. Moore, Inc., 118 Idaho 297, 303 (1990) ("[A]n agency relationship is created where one who hires another has retained a contractual right to control the other's manner of performance." (citations omitted)). An agent's actions may only be attributed to the principal if those actions were taken "within the course and scope of authority delegated by the principal." Bailey v. Ness, 109 Idaho 495, 497 (1985).

Here, plaintiff has alleged that the Idaho Department of Corrections ("IDOC") "retain[s] clear supervisory and monitoring power over CCA's operation and management of the ICC," (Compl. ¶ 8), and that CCA "act[ed] under the supervision of the Idaho Department of Corrections" at all times, (id. ¶ 122).

13

Although these allegations may establish an agency relationship with respect to CCA's management of the ICC, they do not establish that the IDOC retained any right of control with respect to CCA's employment decisions.

Plaintiff also alleges that the IDOC required CCA "to only employ persons who satisfy the Idaho Board of Correction's personnel policies," (Compl. ¶ 9), and that IDOC required CCA to hire "sufficient qualified personnel to implement the terms of the contract," (id. ¶ 15). Even if plaintiff is correct that the IDOC set guidelines for whom CCA could hire, it does not follow that it set guidelines for whom CCA could fire. Plaintiff offers no allegations indicating that he was terminated at the IDOC's direction or pursuant to any guidelines set forth by the IDOC; rather, his allegations establish that CCA exercised its discretion to terminate his employment after conducting its own internal investigation. (See Compl. ¶¶ 90-100.)

Because plaintiff has not alleged any facts showing that IDOC "has any right to control [or] did control" the firing of plaintiff or other ICC employees, he has not stated a claim that CCA was acting within the scope of an agency relationship with IDOC when it terminated him. See Cohen v. Salick Health Care, Inc., Civ. No. 89-9025 RJB, 1992 WL 7033, at *3 (E.D. Pa. Jan. 6, 1992) (holding that contractor did not act as an "agent" under Pennsylvania whistleblower statute when it terminated the plaintiff because the principal, a state hospital, "had the right to assert control over the medical and clinical affairs of the cancer care center but did not have the right to control the . . . firing of [defendant's] employees"). Accordingly, because

plaintiff has not alleged that CCA's termination of his employment occurred "within the course and scope" of its agency relationship with IDOC, Bailey, 109 Idaho at 497, the court must grant defendants' motion to dismiss plaintiff's IPPEA claim.

### C. Termination in Violation of Public Policy

Although Idaho law generally permits an employer to terminate an at-will employee for any reason or for no reason, it "recognizes a narrow exception to the at-will employment presumption when the employer's motivation for the termination contravenes public policy." Bollinger v. Fall River Rural Elec. Co-Op., Inc., 152 Idaho 632, 640 (2012) (citing Van v. Portneuf Med. Ctr., 147 Idaho 552, 561 (2009)). "This public policy exception is triggered only where an employee is terminated for engaging in some protected activity, which includes (1) refusing to commit an unlawful act, (2) performing an important public obligation, or (3) exercising certain rights and privileges." Bollinger, 152 Idaho at 640; see also Orloff v. United Parcel Serv., 490 Fed. App'x 38, 39 (9th Cir. 2012) ("[T]he Idaho Supreme Court has made clear that the initial trigger for the exception is the protectable action by the employee whose employment was adversely affected, not the bad motivation of the employer." (citation omitted)). The public policy at issue must be "rooted in case law or statutory language." Bollinger, 152 Idaho at 640. (quoting Edmondson v. Shearer Lumber Prods., 139 Idaho 173, 177 (2003)) (internal quotation marks omitted).

Here, plaintiff alleges that he was terminated because he performed the "important public function" of informing his superiors that staffing levels at ICC were inadequate. (Compl. ¶

133.)  Plaintiff contends that CCA's failure to maintain adequate staffing levels at the ICC not only violated the terms of its contract with the IDOC and the terms of a settlement agreement requiring CCA to maintain adequate staffing levels, (see id.), but also violated Idaho Code sections 20-209 and 20-241A, which set forth specific standards that private prisons in Idaho must comply with and incorporate by reference additional standards set by the IDOC, (see Pl.'s Opp'n at 20).

The facts alleged here are distinct from those in Bollinger, in which the court held that a plaintiff who was allegedly fired after reporting safety violations to her employer could not prevail on her public policy claim. 152 Idaho at 641-42. There, the court reached this conclusion because the plaintiff "fail[ed] to pinpoint any particular statute or regulation that would support her claim that her reports of safety issues implicated a public policy sufficient to justify an exception to at-will employment." Id. at 641. Plaintiff, unlike the plaintiff in Bollinger, has "identif[ied] a legal source for those alleged rules and regulations" that he believed were implicated by the ICC's alleged failure to maintain adequate staffing. Id.; see also Thomas v. Med. Ctr. Physicians, P.A., 138 Idaho 200, 208 (2002) (holding that a physician who was allegedly terminated for reporting falsified medical records could state a public policy claim because the conduct that plaintiff reported "is unlawful and involves the health and welfare of the public").

Because plaintiff has alleged that his concerns about inadequate staffing were grounded in specific provisions of Idaho

16

statutory law and that he was terminated for voicing these concerns, he has sufficiently alleged that his termination violated public policy. See Bollinger, 152 Idaho at 640. Accordingly, the court must deny defendants' motion to dismiss this claim.

D. Intentional Infliction of Emotional Distress

"In Idaho, four elements are necessary to establish a claim of intentional infliction of emotional distress: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe." Edmondson, 139 Idaho at 179 (citing Curtis, 123 Idaho at 601 (1993)).

Defendants contend only that plaintiff has failed to allege extreme or outrageous conduct. (Defs.' Mem. at 19 (Docket No. 10).) In order to be "extreme or outrageous," Idaho law requires that the conduct at issue be "atrocious" and "beyond all possible bounds of decency." Edmondson, 139 Idaho at 180. If "reasonable men [sic] may differ" on whether the defendant's conduct was extreme or outrageous, the court must permit the jury to decide that question. Id. at 180 (citing Restatement (Second) of Torts § 46, comment h).

Ordinarily, termination from employment, without more, is not extreme or outrageous enough to support a claim for IIED. In Edmondson, for instance, the Idaho Supreme Court held that a lumber-mill employee who was fired for his association with an environmental group could not prevail on an IIED claim, even though he alleged that the defendant "abuse[d] its power" by

17

firing him and knew of his "susceptibility to emotional distress." 139 Idaho at 180.

Here, however, plaintiff alleges that the retaliatory nature of his termination and the disclosure of his firing "within the relatively small community of corrections professionals in Idaho" made his termination extreme and outrageous. (Compl. ¶¶ 104, 106, 115.) At this stage in the litigation, the court cannot determine that reasonable minds would not differ on whether defendants' conduct was extreme and outrageous. See Edmondson, 139 Idaho at 180. To the extent that the cases cited by defendants suggest that defendants' conduct was not sufficiently extreme or outrageous, those cases reached that conclusion on summary judgment after discovery had yielded a more accurate picture of the facts. See id. at 179-80; Bollinger, 152 Idaho at 643. Accordingly, the court must deny defendants' motion to dismiss this claim.

E. Negligent Infliction of Emotional Distress

"There are five elements to a claim for negligent infliction of emotional distress in Idaho: (1) the existence of a duty; (2) a breach of that duty; (3) proximate cause; (4) damages; and (5) physical manifestation of the injury." Sommer v. Elmore County, 903 F. Supp. 2d 1067, 1075 (D. Idaho 2012) (Bush, M.J.) (citing Czaplicki v. Gooding Joint Sch. Dist. No. 231, 116 Idaho 326 (1989)). "Extreme and outrageous conduct is not a required element of an action for negligent infliction of emotional distress." Johnson v. McPhee, 147 Idaho 455, 465 (Idaho Ct. App. 2009).

Under Idaho law, "the mere termination of an at-will

employee--without more--does not constitute the breach of a duty sufficient to support an NIED claim." Bollinger, 152 Idaho at 643. Nor may a terminated at-will employee prevail on an NIED claim simply because his termination violated the employer's duty of good faith and fair dealing. Sommer, 903 F. Supp. 2d at 1077. Defendants therefore contend that because plaintiff was an at-will employee, he cannot assert a claim for NIED. (Defs.' Mem. at 20.)

Although plaintiff was an at-will employee, he alleges that defendants breached their duty "to ensure that [their] employees were not being terminated in violation of public policy." (Compl. ¶ 162.) Although no Idaho court has expressly held that an employee who is terminated in violation of public policy may bring an NIED claim, one Idaho Supreme Court decision, Sorensen v. Saint Alphonsus Regional Medical Center, Inc., 141 Idaho 754, 761 (2005), suggests that plaintiff has stated a viable claim. There, the court held that a plaintiff who was terminated from her employment could not bring an NIED claim because "she was an employee at will who could be terminated at any time with or without cause absent a violation of public policy," and that "[n]o violation of public policy is implicated in this case." Id. The Supreme Court of Washington, which has adopted a materially identical rule with respect to whether an employer has a duty of care, has also held that an at-will employee is barred from bringing an NIED claim "absent a statutory or public policy mandate." Snyder v. Med. Serv. Corp. of E. Wash., 145 Wash. 2d 233, 244 (2001) (en banc) (citation omitted).

In holding that the plaintiff's claims in Sorensen were barred "absent a violation of public policy," 141 Idaho at 761, the Idaho Supreme Court seems to imply that it would recognize a claim for NIED if the plaintiff were terminated in violation of public policy. See Hayes v. County of San Diego, 658 F.3d 867, 871 (9th Cir. 2011) ("[W]here the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." (citations and internal quotation marks omitted)). Accordingly, because plaintiff has alleged that defendants breached a duty of care by terminating him in violation of public policy, the court must deny defendants' motion to dismiss this claim.

IT IS THEREFORE ORDERED that defendants' motion to dismiss be, and the same hereby is, GRANTED with respect to plaintiff's claims under 42 U.S.C. § 1983 and the Idaho Protection of Public Employees Act, I.C. § 6-2101 et seq., and DENIED in all other respects.

Plaintiff has twenty days from the date this Order is signed to file an amended complaint, if he can do so consistent with this Order.

Dated: March 17, 2014

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE