Howard A. Belodoff, ISB No. 2290
BELODOFF LAW OFFICE PLLC
1004 West Fort Street
Boise, ID 83702
Telephone: (208) 331-3378
Facsimile: (208) 947-0014
Email: hbelodoff@hotmail.com

Jeremiah M. Hudson, ISB No. 8364
Fisher & Hudson, PLLC
910 W. Main St., Ste. 254
Boise, ID 83702
Telephone: (208) 345-7000
Facsimile: (208) 297-2689
Email: jeremiah@fisherhudson.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHANE JEPSEN, an individual,<br><br>v.<br><br>CORRECTIONS CORPORATION OF AMERICA, a Tennessee Corporation and KEVIN MYERS, in his individual and official capacity. | Civil Action No. 1:13-CV-454<br><br>**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

## AMENDED COMPLAINT

On March 17, 2014 the Court has issued a Memorandum and Order Re: Motion to Dismissr

dismissing Plaintiff's claims under 42U.S.C. §1983 and the Idaho Protection of Public Employees

Act, I.C. § 6-2101 *et seq.*. The Court further ordered that the Plaintiff has twenty days from the date of the above-mentioned Order to file an amended complaint, if Plaintiff can do so consistent with the Court's Order. Plaintiff Shane Jepsen (hereinafter referred to as "Jepsen" or "Plaintiff") by and through his attorneys, hereby submits his Amended Complaint against Defendants Corrections Corporation of America ("CCA"); and Kevin Myers ("Defendant Myers"), (collectively "Defendants") as follows:

## I.    PRELIMINARY STATEMENT

1.    CCA is a for profit business that has a contract with the State of Idaho to operate and manage the Idaho Correctional Center ("ICC"). The ICC facility is owned by the State of Idaho.

2.    The ICC was built with Idaho taxpayer funds and is located on land that is owned by the State of Idaho.

3.    Under the contract CCA receives taxpayer funds, utilizes public facilities and serves a public purpose of incarcerating convicted felons who would otherwise be incarcerated in state owned prison facilities at a greater cost to the taxpayers.

4.    The State of Idaho continually monitors the contract to ensure compliance by employing monitors who regularly visit ICC, confer with CCA officials and report to the Director of the Idaho Department of Corrections or his designee.

5.    The State entered into the contract because it determined that CCA could operate and manage the ICC for less than the State of Idaho would have to spend if the ICC was operated by the Idaho Department of Corrections.

6.    CCA has operated ICC for less than the Idaho Department of Corrections would have spent to operate the ICC during the term of the contract.

7.      The Idaho Board of Corrections and the Idaho Department of Corrections monitors, pursuant to statutory authority and the contract with ICC, CCA's compliance with the contract to ensure it is meeting all requirements of state and federal law and the Constitution of the State of Idaho and the United States Constitution for the housing, care and control of inmates incarcerated at the ICC.

8.      The Director of the Idaho Department of Corrections or his designee is required to retain clear supervisory and monitoring power over CCA's operation and management of the ICC to ensure that inmates are protected and that the employees of the facility and the public are adequately protected.

9.      ICC is required to only employ persons who satisfy the Idaho Board of Correction's personnel policies.

10.     CCA is required under the contract to train its personnel to a level acceptable to the Idaho Department of Corrections.

11.     CCA receives physical custody of persons sentenced by the courts of the State of Idaho for purposes of incarceration. CCA is acting as an agent of the State of Idaho.

12.     The State continues to retain jurisdiction over persons incarcerated at the CCA under the contract.

13.     In order to be awarded the contract CCA was required to demonstrate to the satisfaction of the State Board of Corrections that it could provide the services provided in the contract including providing the necessary qualified personnel to implement the terms of the contract.

14.     In order to be awarded the contract CCA was also required to demonstrate to the satisfaction of the State Board of Corrections that it had the ability to comply with applicable court orders and correctional standards.

15.    In order to be awarded the contract CCA was also required to demonstrate to the satisfaction of the State Board of Corrections that it could obtain insurance or provide self-insurance to indemnify the sate against possible claims arising from the operation of the ICC and to compensate the State for any losses incurred due to the operation of the ICC.

16.    The ICC houses over 2,000 inmates classified as close or medium custody.

17.    ICC is an extremely violent prison and has come to be known as the "Gladiator School."

18.    The level of inmate on inmate violence in the ICC was significantly higher than in other prisons operated by the Idaho Department of Corrections.

19.    Inmates, on behalf of themselves and as representatives of a class of similarly situated inmates incarcerated at the ICC, filed a Complaint in the United States District Court for the District of Idaho, *Kelly v. Wengler*, Case No. 1:11-CV-185-S-EJL, which alleged that the violence perpetrated upon them while incarcerated at the ICC, the inadequate staffing and training and other policies of the CCA in the operation and management of the facility violated their right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

20.    CCA agreed to a Settlement Agreement, Dkt. No. 25, Exhibit A, incorporated by reference, with the inmates that required, in relevant part, to provide mandatory staffing of posts by security staff in the ICC as required by the contract and the Settlement Agreement.

21.    The Settlement Agreement provided that the plaintiffs' class counsel could monitor CCA's compliance.

22.    The relief granted in the Settlement Agreement was scheduled to terminate in two years which would have been in mid September 2013 unless the Court extended the deadline.

23.    Plaintiff Jepsen was employed by CCA as the Chief of Security at ICC.

24.     Plaintiff Jepsen's immediate supervisors were the Warden and Assistant Wardens at the ICC.

25.     Plaintiff Jepsen, as early as September 2010 and on a continual basis thereafter, informed the Warden of ICC, Timothy Wengler, and two Assistant Wardens of staffing vacancies and inaccuracies in the staffing records.

26.     Plaintiff Jepsen made requests to Warden Wengler for additional staff to fill the security staff vacancies and shortages on the shifts in order to comply with the Court Settlement Agreement and contract.

27.     Staffing shortages were common knowledge among the security staff and supervisors.

28.     Security staff were told to make do with the officers they had available.

29.     Security staff reported the staffing shortage directly to officials at the CCA on the online reporting system.

30.     Warden Wengler was made fully aware, by Plaintiff Jepsen, of his concerns about failing to comply with the staffing requirements of the contract and the Court Settlement Agreement.

31.     Warden Wengler occasionally examined and approved the staffing rosters.

32.     Warden Wengler made changes to the staffing roster report which did not have the necessary detail to disclose the failure to staff mandatory posts and what hours were actually worked or the ability to spot actual double postings.

33.     The Idaho Department of Corrections was made aware of the staffing vacancies and concerns raised by Plaintiff Jepsen during their monitoring and meeting with officials at the ICC.

34.     The Idaho Department of Corrections continually informed CCA of their concerns with the staffing shortages and vacancies as early as the end of December 2010.

35.     Warden Wengler, in response to the Idaho Department of Corrections staffing concerns,

represented in January 2011 that "CCA is committed to ensuring that all mandatory posts are filled at all times," and committed to provide shift rosters with the detail needed for IDOC to monitor the staffing practices at the ICC.

36.     On January 23, 2013, following public disclosure that CCA allegedly had falsified the staffing records, the Idaho Department of Corrections announced the Idaho State Police were going to investigate CCA.

37.     On January 28, 2013 CCA, after allegedly conducting a preliminary investigation into falsified shift records, that made it appear that mandatory staffing posts were filled when they were being left vacant, placed Plaintiff Jepsen on administrative leave.

38.     On April 23, 2013 Plaintiff Jepsen was informed that his employment with CCA was terminated.

39.     The Idaho Department of Corrections was informed of the reasons for Plaintiff Jepsen's termination.

40.     Plaintiff Jepsen has never been accorded any type of hearing or given an opportunity to contest the reasons for his termination or present evidence.

41.     Plaintiff Jepsen did not falsify any staffing rosters.

42.     Plaintiff Jepsen had no authority or ability to rectify or address the staffing vacancies and shortages he continually identified to his supervisors at the ICC.

43.     Plaintiff Jepsen was only able to make the staffing deficiencies known to the Warden and Assistant Wardens.

44.     The Warden and Assistant Warden were fully aware and failed to address the acute staffing deficiencies that Plaintiff Jepsen made known to them in the course of his duties.

45.     Defendants have publically sought to place the blame on Plaintiff Jepsen for the staffing

shortages to divert their failure and responsibility to comply with the contract and Settlement Agreement.

46. The Idaho Department of Corrections has determined that the problem of not staffing mandatory posts and staff vacancies continues at the ICC.

47. Defendants terminated Plaintiff Jepsen to attempt to protect their ability to renew their $29 million contract with the State of Idaho and to prevent the Court from finding CCA in contempt and extending the term of the Settlement Agreement for failing to comply with the staffing requirements.

48. On September 16, 2013, the Honorable David O. Carter, United States District Judge, For the Central District of California Sitting by Special Designation, issued a Memorandum Decision and Order, Dkt. No. 76, incorporated by reference, found that the CCA was in civil contempt for violating the Settlement Agreement.

49. Plaintiff seeks relief for his unlawful and wrongful termination pursuant to 42 U.S.C. § 1983 ("§ 1983") for violation, under color of state law, of his rights under the Due Process Clause of the Fourteenth Amendment and under state law, including but not limited to, the Idaho Whistleblower Statute, Idaho Code § 6-2101, et seq.,. Plaintiff seeks all available equitable relief, monetary damages, attorneys' fees, costs, and interest.

## II.   PARTIES

50. The Plaintiff is an adult citizen of the State of Idaho. In 2000 Plaintiff was hired by CCA as an employee and was continually employed until he was terminated in April of 2013.

51. Defendant Corrections Corporation of America ("CCA") is a for profit business incorporated under the laws of the State of Maryland. CCA principle place of business is in

Nashville, Tennessee. CCA operates and manages the ICC as a contractual agent for the State of Idaho. The Idaho Department of Corrections ("IDOC") administers and monitors CCA's performance and compliance with the state contract. CCA agreed under the contract to incarcerate Idaho state inmates who have been committed to legal custody of IDOC at the Idaho Correctional Center ("ICC") in Kuna, Idaho in exchange for approximately $29,000,000 per year. The IDOC Contract is set to expire in June of 2014.

52.     Defendant Kevin Myers is the Managing Director of ICC for CCA. Defendant Meyers is a citizen of the State of Tennessee.

## III.     JURISDICTION AND VENUE

This Court has original jurisdiction under the provisions of 28 U.S.C. § 1332 with respect to Plaintiffs and Defendants because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

53.     This Court also has jurisdiction over the state law claims asserted herein pursuant to its Supplemental Jurisdiction powers authorized by 28 U.S.C. § 1367.

54.     Venue is proper with this Court because the alleged unlawful conduct occurred within the jurisdiction of this Court.

55.     Injunctive and declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

## IV.     GENERAL ALLEGATIONS

### Jepsen's Employment

56.     Jepsen began working for CCA at ICC on June 12, 2000 as a Correctional Officer.

57.   Jepsen worked his way up the ranks, and in 2008, Jepsen was promoted to Chief of Security, the third-highest ranking position at ICC below the Warden and Assistant Wardens.

58.   Jepsen did not make policy or budgeting decisions as Chief of Security for CCA.

59.   As Chief of Security, Jepsen worked almost exclusively on the day shift, and did not have the responsibility or job duty to fill out shift rosters.

60.   On April 23, 2013, Defendant terminated Jepsen's employment from CCA.

61.   On April 23, 2013, Defendant Myers alleged that Jepsen's termination was for the following reasons: (a) there were vacancies in ICC staffing records, (b) Jepsen was responsible for ICC's compliance with staffing patterns for security and the accuracy of accompanying documentation, and (c) Jepsen "may have had some knowledge of vacancies or inaccuracies in staffing records but failed to investigate and take corrective action."

## Defendants' Prior Knowledge of Staffing Vacancies or Inaccuracies

62.   On June 3, 2010, at a monthly meeting between IDOC and CCA regarding the ICC prison("June 3, 2010 meeting") various IDOC and CCA Officials, including Defendant Myers, CCA Warden Timothy Wengler ("Warden Wengler"), CCA Assistant Warden Anastacio Perez, CCA Senior Director Andrea Evans, and CCA Chief of Unit Management Tracy Koosman, among others, discussed, among other things, staffing vacancies during the evening hours that had been discovered by IDOC Contract Monitor Matt Vallard after he had reviewed ICC's shift rosters from April of 2010.

63.   During the June 3, 2010 meeting, IDOC Contract Monitor Vallard informed the above-named Defendants, that "[t]he staffing plan in the [IDOC] contract provides for 1 pod control officer and 3 floor officers in most housing units.  The rosters indicated staffing in most pods

were being reduced to 2 or 3 officers during those evening hours. In the PIE building there were often only 2 officers on duty." (See *Exhibit A*, attached hereto and incorporated)

64.     During the June 3, 2010 meeting, Contract Monitor Vallard informed the above-named Defendants, that based on his review of ICC shift rosters from April of 2010, housing unit security posts during the second shift at ICC were being vacated around 10:30pm and not being staffed again until around 5:30am.

65.     During the same June 3, 2010 meeting, Warden Wengler stated that ICC's shift rosters would be reformatted.

66.     Jepsen did not attend the June 3, 2010 meeting.

67.     Jepsen was never informed of the meeting or any of the issues discussed at the June 3, 2010 meeting.

68.     Jepsen was never disciplined or reprimanded as a result of any of the vacancies discussed at the June 3, 2010 meeting.

69.     Sometime between June 3, 2010 and November of 2010, CCA officials reformatted the ICC staffing Rosters. Prior to the reformatting, the shift rosters would indicate by each shift position either an employee's name or the term "**Vacant**". After the reformat, the shift rosters would not indicate vacancies. Rather, the rosters included multiple employees' names next to the some of the shift positions. The shift positions on the reformatted shift roster that had multiple names in a single staff position did not specify when, or for how long, the named employees worked at that shift position.

70.     On September 10, 2010, Jepsen informed Warden Wengler and CCA of regularly vacant posts when Jepsen sent an email to Warden Wengler detailing the vacancies during each day and night shift from August 27, 2010 through September 9, 2010. The night shift vacancies ranged

between six (6) and twelve (12) employees per shift. (See Exhibit B attached hereto and incorporated)

71. On November 3, 2010, Jepsen sent a memorandum ("Jepsen Memo") to Warden Wengler, as well as Assistant Wardens Kessler and Perez, in which Jepsen stated that after reviewing shift rosters audited by IDOC, common problems included (a) posting of Sergeants, Correctional Counselors, and Case Managers into Correctional Officer vacancies, and (b) staff working two to three posts during a shift without any explanation, "giving the appearance of Officer Doe covering three posts." (See Exhibit C attached hereto and incorporated)

72. In the Jepsen Memo, Jepsen informed Warden Wengler and Assistant Wardens of other problems, including "standing down" officer posts late in the evening and staff shortages.

73. In the Jepsen Memo, Jepsen recommended that CCA hire accordingly to fill each vacancy, and amend the contract with IDOC. Jepsen also informed Warden Wengler that he did not have the answer to avoiding putting supervisors and case managers in correctional officer positions, "as this has always been common practice."

74. On December 20, 2010, Natalie Warner, an IDOC official, detailed specific problems IDOC found with staffing at ICC in a memo ("Warner Memo") to Warden Wengler, which included: (a) shift supervisors "posted to provide ancillary tasks"; (b) employees assigned to multiple posts on the same day; and (c) case managers were assigned correctional officer posts, which is "an unacceptable practice" (See Exhibit D attached hereto and incorporated)

75. On January 28, 2011, Jepsen emailed multiple Unit Managers, Lieutenants, and Captains, and carbon copied Warden Wengler, Assistant Warden Kessler, and Chief of Unit Management Koosman, stating, among other things "There needs to be more effort placed on keeping the rosters up to date, at all times. There are people coming to work that are not listed on the daily

roster, people are here that are not listed on the roster, people are on the rosters that are not here. As you see this is a problem…" Jepsen further stated "All mandatory post's must be filled at all times, you will have to plan ahead and ensure this is adhered to […]" (See *Exhibit E*, attached hereto and incorporated)

76.     On June 13, 2011, Natalie Warner, from IDOC, sent a letter to Natasha Metcalf, Vice President of Customer Contracts for CCA, regarding IDOC's prior assessment that CCA had not complied with the contractually required staffing at ICC. (See *Exhibit F*, attached hereto and incorporated)

77.     In September of 2011, Warden Wengler, on behalf of CCA, entered into a Settlement Agreement with a class of CCA inmates, which includes a requirement that ICC would be fully staffed (See *Kelly v. CCA*, 1:11-cv-00185-EJL, Dkt 25, Exhibit A.)

78.     In the Fall of 2011, Jepsen informed Defendant Myers, on multiple occasions, that ICC did not have enough employees to cover the contractual staffing requirements.

79.     On November 28, 2011, Jepsen emailed multiple Unit Managers, Lieutenants, and Captains, and carbon copied Warden Wengler, Assistant Wardens Kessler, and Chief of Unit Management Koosman, stating, among other things "…once again, pay close attention to correctly assigning/filing in the daily roster (don't forget to list the security staff members that are here on the clock, i.e. Sergeant Geeson, etc.) these rosters are viewed by IDOC on a monthly basis and must be correct." (See *Exhibit G*, attached hereto and incorporated)

80.     In a "Weekly Captain/Unit Management Meeting" on February 14th 2012, which was facilitated by Assistant Warden Kessler, Jepsen stated that "DEF Sgt. And CC are not to be utilized on the floor. We need to plan ahead to ensure the unit is staffed accordingly. The unit team needs to be working with the Master Scheduler, Captains and Lieutenants to have proper

coverage- therefore being proactive is a requirement." (See *Exhibit H* attached hereto and incorporated)

81.    In a "Monthly Operations Meeting" on February 21ˢᵗ 2012, that was administered by Assistant Warden Kessler, and was also attended by Assistant Warden Ibarra, Jepsen stated that "The Case Managers in DEF should not be posted on the floor."    "Building schedule is being looked at.   Several suggestion made by staff, and Lieutenants are to report here for Back to Basics Training on March 7ᵗʰ. The goal is to find inconsistencies in the shifts and come up with solutions." (See *Exhibit I* attached hereto and incorporated)

82.    In a "Monthly Operations Meeting" on April 17ᵗʰ 2012, which was administered by Assistant Warden Kessler, Jepsen stated that "Officers working overtime that want to take a break outside, have to clock out.  Try to let them go at a slow time, and make sure they are not utilized on the roster," as well as "Thank you for re-arranging your schedules to cover shifts." (See *Exhibit J* attached hereto and incorporated)

83.    In a "Monthly Operations Meeting" on November 14ᵗʰ 2012, which was attended by Jepsen, Assistant Chief Melody, Chief Koosman, Assistant Warden Kessler, and Warden Wengler, Jepsen stated that "Log books are improving, but there is still a lot of work to be done." And to "Keep on the building schedule" (See *Exhibit K* attached hereto and incorporated)

84.    Around January 1, 2013, Captain Earl Johnson ("Captain Johnson") informed Jepsen that IDOC Contract Monitor Vallard was implying that there may be potential falsification of shift documents, and if IDOC discovered such, the evidence could be turned over to the District Attorney's office for prosecution. (See *Exhibit L* attached hereto and incorporated)

85.    In early January of 2013, Jepsen instructed Captain Johnson to make a written documentation to CCA via a 51-C company form, documenting Captain Johnson's conversation

with Vallard. (See *Exhibit L*)

86.     On January 8, 2013, Captain Johnson sent a completed 51-C form to Jepsen. The same day, Jepsen, forwarded Captain Johnson's 51-C to Defendant Myers and Assistant Wardens Kessler and Ibarra. (See *Exhibit L*)

87.     On January 11, 2013, Jepsen offered to assist Warden Wengler in printing copies of Lobby Management reports, which Jepsen believed IDOC had requested in order to compare shift rosters with actual attendance by ICC staff. Warden Wengler declined Jepsen's offer to assist.

88.     On January 23, 2013, Rebecca Boone, a reporter from the Associated Press ("AP Reporter Boone"), published an article entitled "Inmates Claim private prison falsifies staff logs," which related to an allegation that ICC staff members falsified shift rosters.

89.     On January 28, 2012 IDOC produced ICC's shift logs and overtime reports to AP Reporter Boone pursuant to an Idaho public records request.

90.     On January 28, 2013, CCA placed Jepsen and the Assistant Chief of Security Melody on Administrative Leave.

91.     According to Scott Craddock, Assistant General Counsel and Ethics Officer for CCA, Jepsen and the Assistant Chief of Security Melody were targeted because CCA had retained an independent investigator, Patti Ball, who had made a "preliminary determination that [Jepsen and Melody] were aware of and/or involved in the conduct resulting in the shift roster discrepancies…" and "[t]hey posed a risk to the investigation" and CCA's investigator "found no evidence that either Melody or Jepsen informed their superiors, including Warden Wengler, about the roster falsification…." (See *Kelly, et. al v. Wengler, et al.*, Case 1:11-cv-00185-EJL, Dkt 73, Attached hereto and incorporated as *Exhibit M*, ¶¶ 3-7)

92.     On January 30, 2013, CCA investigator Patti Ball interviewed Jepsen about roster falsification.

93.     January 30, 2013 was the first time Patti Ball interviewed Jepsen about this issue.

94.     On February 5, 2013, based upon her review of the shift rosters and overtime reports, AP Reporter Boone reported that CCA employees had falsified approximately 4,800 hours over a seven (7) month period of time.

95.     According to Ethics Officer Craddock, on February 5, 2013, CCA retained a new law firm to take over the staffing investigation. The new investigators' review focused primarily on ICC staffing during the night shifts between April 1, 2012 and October 31, 2012. (See Exhibit M, ¶ 8-9)

96.     According to Ethics Officer Craddock, the investigators reported to him "that the comparison of night shift rosters against Kronos time clock records for mandatory posts revealed a total of approximately 4,778 undocumented hours from April through October 2012..." (See Exhibit M, ¶ 12).

97.     Throughout his employment at CCA, Jepsen was never assigned the task of comparing Kronos time clock records and/or overtime reports with shift rosters.

98.     On April 11, 2013, CCA issued a press release admitting that they discovered "some inaccuracies" in shift rosters;  they had informed their "partners at the Idaho Department of Corrections (IDOC)"; and that they "...deeply regret the decisions made by certain ICC staff members... We will take appropriate disciplinary action with the involved personnel..." (See *Exhibit N* attached hereto and incorporated)

99.     On April 23, 2013, Jepsen was terminated from his employment at CCA.

100.    In a letter dated April 23, 2013, Defendant Myers stated that Jepsen was being terminated

because, "[i]nvestigation has revealed that staffing records for the period April through October 2012 contained incorrect information and, during the same period, that staffing of contractual mandatory posts could not be verified for certain times. Compliance with the contract staffing pattern for security and the accuracy of accompanying documentation falls within the duties of the Chief of Security. In addition, evidence exists which suggests that you may have had some knowledge of vacancies or inaccuracies in staffing records but failed to investigate and take corrective action. Your conduct violates CCA's guiding principles and your employment is hereby terminated." (See *Exhibit O* attached hereto and incorporated)

101.    At no time during his employment at ICC, did Jepsen fill out an employee roster that was falsified, nor did he instruct any other employee to do so.

102.    Based upon information and belief, CCA has not terminated any employee for actually falsifying an employee roster.

103.    On April 29, 2013, Jepsen filed a grievance with CCA disputing his termination. In response, CCA Vice-President Jimmy Turner refused to overturn Jepsen's termination, by writing, among other things, "You stated during our call that you had delegated the duty of review and approval to your Assistant Chief of Security. You cannot, however, delegate your ultimate responsibility as the Chief of Security. Your failure to carry out your responsibility is misconduct."

104.    Around the end of April, 2013, Defendant Myers conducted multiple staff meetings on behalf of CCA, which was attended by most or all of ICC's correctional counselors and correctional officers, where Defendant Myers or other CCA officials told the counselors and officers that Jepsen had been terminated as a result of the roster falsification.

105.    In doing so, Defendant Myers implicated Jepsen in theft, in violation of I.C. § 18-2403 et

seq. and conspiracy to commit theft.

106. Warden Wengler retired in May of 2013, however, based upon information and belief, continues to be on CCA's payroll.

107. CCA officials publicly disclosed Jepsen's termination within the relatively small community of corrections professionals in Idaho.

108. On June 11, 2013, attorneys for the American Civil Liberties Union filed a "Motion For An Order To Show Cause Why The Defendants Should Not Be Held In Contempt of Court" for the falsified shift rosters. (See *Kelly, et. al v. Wengler*, *et al.*, Case 1:11-cv-00185-EJL, Dkt 39).

109. On September 16, 2013, This Court issued a decision in the *Kelly v. Wengler* case, where it found CCA in Contempt of Court, and stated, among other things, that the "responsibility to check on mandatory staffing posts falls higher than Wengler's subordinates: it falls on him, and it falls on CCA." (See *Exhibit P*, attached hereto and incorporated)

110. Jepsen has been unable to find a job in the corrections industry, or any comparable employment, since his termination.

111. Jepsen's monthly income has been reduced substantially as a result of his termination.

112. Jepsen is actively seeking employment. When he writes a job application, Jepsen must now answer in the affirmative when he is asked if he has been terminated from a job, often by simply checking a box.

113. Jepsen has experienced an extreme amount of emotional distress because of CCA's conduct while terminating him. This emotional distress has caused Jepsen to suffer from insomnia, anxiety, depression, and substantial weight gain.

114. In terminating Jepsen in April of 2013, CCA officials made clear that they had to protect CCA's reputation in Idaho so IDOC would continue to allow CCA to run ICC pursuant to the

IDOC contract, despite CCA's material breach of the IDOC Contract.

115. CCA has chosen to protect its reputation, retain its option to renew its contract with the State of Idaho and defend its from a Court finding of contempt and an extension of the Settlement Agreement by casting the blame solely on Jepsen and the Assistant Chief of Security as the only CCA employees responsible for CCA's longstanding understaffing at the ICC and staff roster falsification.

116. CCA officials used Jepsen as a scapegoat for CCA's wrongdoing in an attempt to divert both public scrutiny as well as the scrutiny of the Court in the *Kelly* case.

117. It was the high ranking CCA Officials who changed the format of the employee staff rosters, in 2010, in such a way that IDOC Contract Monitors would not be able to detect shift vacancies on the face of the reformatted roster, and thereby making it simpler for ICC to falsify employment rosters without detection.

118. Plaintiff has no adequate remedy at law. Plaintiff is suffering and will continue to suffer irreparable injury from Defendants' acts unless relief is provided by this Court. Accordingly, Plaintiff is entitled to injunctive relief.

119. Plaintiff is entitled to a declaration of his legal rights from the Court, as well as preliminary and permanent injunctive relief requiring Defendants to refrain from violating their legal obligations

### FIRST CLAIM FOR RELIEF
### Wrongful Discharge In Violation Of Public Policy

120. Plaintiff realleges and incorporates by reference all paragraphs set forth above.

121. At all relevant times, CCA was the statutory and contractual agent of the IDOC, which is a state agency.

122. At all relevant times, Jepsen performed an important public function as the Chief of

Security of a privately operated and managed a prison for and on behalf of the State of Idaho.

123. Jepsen performed an important public function by informing CCA that it was not meeting the mandatory staffing requirements set forth in the $29 million IDOC Contract and required by the Settlement Agreement.

124. At all relevant times, Jepsen's actions of informing his superiors of ICC's staff vacancies and the staff roster deficiencies in violation of the $29 million IDOC Contract and Settlement Agreement; double posting of employees on rosters in violation of the $29 million IDOC Contract and Settlement Agreement; the inability of CCA to meet its contractual staffing requirements without budgeting for more employees; and by requesting that Captain Johnson formally document potential fraudulent activity occurring among CCA staff to CCA, which Jepsen subsequently submitted to Warden Wengler, were all actions taken by Jepsen that are protected by public policy of the State of Idaho. Jepsen gave statements and written documents to his superiors at CCA that informed them that CCA was in violation of the IDOC contract and the Settlement Agreement, i.e. that there was understaffing and inaccurate shift rosters at ICC.

125. Jepsen gave statements and written documents to his superiors at CCA that informed them that staff vacancies and shortages at ICC was occurring on a regular basis, which implicated potential Eighth Amendment violations against persons who were incarcerated at the ICC but were under the jurisdiction of the State of Idaho and the Idaho Department of Corrections.

126. CCA took adverse action against Jepsen by placing him on administrative leave and then terminating him in violation of public policy.

127. Jepsen was singled out, which is evident by the fact that he continually communicated with Warden Wengler about the staff vacancies and shortages and the roster falsification yet was

not placed on administrative leave during the investigation and was not terminated. Further, as of the date of the contempt hearing in *Kelly v. Wengler*—August 7th and 8th, 2013—Warden Wengler testified that he continued to be on CCA's payroll.

128.   A causal connection exists between Jepsen's communications with the Warden and CCA about staff vacancies and shortages and CCA's decision to place Jepsen on administrative leave prior to the completion of the independent investigation and his termination, even though there is no evidence he falsified any staff rosters, was a violation of public policy.

## SECOND CLAIM FOR RELIEF
### Intentional and/or Negligent Infliction of Emotional Distress

129.   Plaintiff realleges and incorporates by reference all paragraphs set forth above.

130.   CCA terminated Jepsen following his nearly thirteen year employment with CCA under the false pretense that Jepsen was responsible for the roster falsification.

131.   CCA's conduct was intentional.

132.   Defendant's conduct was extreme, outrageous and egregious.

133.   As a direct and proximate cause of Defendants' extreme and outrageous conduct Plaintiff Jepsen has suffered and continues to suffer severe emotional distress including but not limited to insomnia, anxiety, depression, and substantial weight gain.

134.   There exists a causal connection between CCA's conduct and Jepsen's severe emotional distress.

135.   Defendants had a duty to protect its employees from false or misleading statements made by CCA officials.

136.   Defendants had a duty to take basic precautions to ensure that its employees were not being terminated in violation of public policy.

137. Defendants breached their duties set forth above when they disclosed false and misleading statements about Jepsen, and when they terminated him in violation of public policy.

## THIRD CLAIM FOR RELIEF
### Defamation

138. Plaintiff realleges and incorporates by reference all paragraphs set forth above.

139. Defendants communicated information concerning the plaintiff to others, i.e., when Defendants officials publicly disclosed Jepsen's termination and Defendants' reasoning in a press release which was subsequently used to publish a newspaper article distributed in the State of Idaho and other places, and was disclosed to other employees at the ICC and the relatively small community of corrections professionals in Idaho.

140. The information communicated by Defendants was defamatory, i.e. in the extent that it was harmful to and damaged Jepsen's reputation.

141. The defamatory statements made by Defendants and its agents about Jepsen were knowingly false or reckless without regard to the truth or falsity of the statements.

142. The defamatory statements made by Defendants and its agents about Jepsen were done with malice due to their knowledge that the statements were untrue or their knowledge that there was a high degree of awareness of the probably falsity of the statements.The plaintiff was damaged because of the communication in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### Defamation Per Se

143. Plaintiff realleges and incorporates by reference all paragraphs set forth above.

144. Defendants communicated information concerning the plaintiff to others, i.e., when

Defendants officials publicly disclosed Jepsen's termination and Defendants' reasoning in a press release which was subsequently used to publish a newspaper article distributed in the State of Idaho and other places, and was disclosed to other employees at the ICC and within the relatively small community of corrections professionals in Idaho.

145. The information communicated by CCA was defamatory, i.e. in the extent that it was harmful to Jepsen's reputation.

146. The defamatory statements made by Defendants and its agents accused Jepsen of committing the illegal act of theft and conspiracy to commit theft, as prohibited by I.C. § 18-2403 et seq.

147. The defamatory statements made by CCA and its agents about Jepsen were knowingly false.

148. The defamatory statements made by Defendants and its agents about Jepsen were done with malice due to their knowledge that the statements were untrue or their knowledge that there was a high degree of awareness of the probably falsity of the statements.

149. The plaintiff was damaged because of the communication in an amount to be determined at trial.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief.

a.    Back pay, in amounts to be determined at trial;

b.    Compensatory and consequential damages in excess of $75,000 exclusive of interest;

c.    Front pay in lieu of reinstatement in excess of $75,000 exclusive of interest;

d.    Injunctive and/or declaratory relief declaring that Defendants violated his right and to remedy the damage to his reputation;

e.      Pre-judgment and post-judgment interest at the highest lawful rate;

f.      Attorneys' fees and costs of this action, including expert witness fees, as appropriate;

g.      Punitive damages;

h.      Any such further relief as justice allows.


PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.


Dated this _____7ᵗʰ_____ day of April, 2014.


_____

Jeremiah M. Hudson
Attorney for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 7th of April 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing and a copy of this document to the following persons:


Michael J. Elia
MOORE AND ELIA, LLP
P. O. Box 6756
Boise, ID 83707
Tel: (208) 336-6900
Fax: (208) 336-7031
Email: mje@mbelaw.net

Peter F. Munger
JACKSON LEWIS P.C.
950 17TH St., Suite 2600
Denver, CO 80202
Tel: (303) 892-0404
Fax: (303) 892-5575
Email: peter.munger@jacksonlewis.com

Jeremiah M. Hudson